Smith, J.
(concurring). I concur in and join the decision of the Chief Judge and the decision to modify the order of the Appellate Division. I write separately in order to focus on several aspects of this litigation. I conclude that (a) the Regents Learning Standards provide students with the minimum skills required by a sound basic education, (b) the remedy should be statewide in scope and (c) the remedy should include the reformulation of the present formula for allocating state funds. All the children of New York are constitutionally entitled to the opportunity of a high school education — up to the 12th grade — that imparts the skills necessary to sustain competitive *933 employment within the market of high school graduates, acquire higher education, and serve capably on a jury and vote.
The Importance of a Sound Basic Education[1]
It is commonly said that education is the State’s most important responsibility. Education is just one of the many responsibilities of the State. Only a few of the responsibilities involving the provision of certain services are actually mentioned in the State Constitution. These include the incarceration of criminals,[2] helping the needy,[3] and providing housing for the poor and the elderly.[4] Of the three, only the section dealing with helping the needy contains the mandatory “shall,” although it then gives the Legislature the discretion to determine “from time to time” how the help to those it classifies as needy is to be provided. There is no discretion, however, in the statement, “The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated” (art XI, § 1). The only discretion is in the hands of parents who do not have to send their children to public schools. Since education is the most important responsibility of the State, it follows, a priori, that building schools that provide children with a sound education is more important than building jails to incarcerate criminals, shelters to house the homeless, and low income housing for the poor. This order of priorities recognizes that a child who has an opportunity for a sound education is less likely to become a criminal or be homeless.
*934 Sound Basic Education Equals A High School Education
Throughout this litigation, the State has ferociously clung to the argument that a sound basic education consists of the ability to read, write, and do math at a rudimentary level.[5] Since these skills are generally acquired by the eighth or ninth grade, the State then argues that this is the constitutional minimum.[6] The view of the State is essentially that of the concurring opinion of Judge Levine in Campaign for Fiscal Equity v State of New York (86 NY2d 307, 324 [1995] [CFE J]), who concluded that “what legitimately might be called an education are the basic literacy (reading and writing) and computational skills and, in a public educational system, citizenship awareness. A public educational system failing to provide the opportunity to acquire those basic skills would not be worthy of that appellation” (id. at 331). Judge Levine disagreed with the holding of the majority that a sound “education should consist of the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury” (id. at 316). The majority in CFE I also stated that this definition did not “definitively specify what the constitutional concept and mandate of a sound basic education entails,” which would take place “after discovery and the development of a factual record” (id. at 317). At this point, the discovery has taken place, and the factual record has been developed.
The record establishes what would strike many as an obvious truth: a high school education is today as indispensable as a primary education was in 1894.[7] Children in the 21st century need the opportunity for more than a ninth grade education to *935 be productive citizens. Back in the 19th century, a high school education was not needed to obtain a good job. Now, a high school education is a prerequisite to most good jobs.* ******[8] Those who lack a high school education and have obtained good jobs have done so in spite of, not because of, the lack of a high school education. While it may be true that there will always be menial low-skills jobs, and thus a need for people to fill them, it should not be the purpose of the public schools to prepare students for those jobs, which are limited in number and dwindling.
It is worth noting that although a secondary education was *936 not as prevalent at the time the Education Article was adopted as it is today, free public education included a high school education. It was in 1853, almost 40 years before the adoption of the Education Article, that the Legislature began allowing districts to form union districts, which could establish a high school. Thus, the public school system that the Education Article constitutionalized included a system that provided a free high school education.
A sound education also connotes the necessary preparation to acquire higher education. In connection with the second section of the Education Article, which constitutionalized the Regents, the Constitutional Convention committee on education stated that “[hjigher education here, as in every other civilized country, has been the chief factor in developing the elementary and secondary schools” (2 Documents of 1894 NY Constitutional Convention No. 62, at 6). Primary and secondary schools and colleges were thus perceived as interdependent, in the same way that they are perceived today. At the time, the common schools primarily prepared students for high school, and only a few went on to college.[9] Now that a high school education has taken the place of a primary education, it should prepare students for higher education.
Thus, the Education Article requires the opportunity for a sound high school education that should prepare students for higher education, or to compete in the employment market of high school graduates.[10]
*937 The Legislature has prescribed that the Regents “shall exercise legislative functions concerning the educational system of the state, determine its educational policies, and, except, as to the judicial functions of the commissioner of education, establish rules for carrying into effect the laws and policies of the state, relating to education” (Education Law § 207). The 16 members of the Regents are elected by concurrent resolutions of both houses of the Legislature, and they in turn appoint the Commissioner of Education who is the head of the State Education Department (SED) (NY Const, art XI, § 2; Education Law §§ 202, 101). The SED carries out the policies enacted by the Regents, and is responsible for the general management and supervision of all of the public schools in the state (Education Law § 101).
Pursuant to their delegated authority, the Regents establish the requirements students must satisfy in order to obtain a high school diploma. In the past, students could obtain a local high school diploma by passing the Regents Competency Tests (RCTs). Plaintiffs offered unchallenged testimony that the RCTs measured eighth grade reading skills and sixth grade math skills. Students who wished to obtain a Regents diploma were required to pass more rigorous tests. That system is being phased out, and a new system is being phased in. Under the new system, students are required to pass five State-administered Regents examinations in four subject areas (English, mathematics, social studies and science) that are aligned with new Learning Standards. Students can obtain a Regents diploma evincing higher levels of achievement in mathematics, science, and foreign language by successfully completing eight Regents examinations.
The State argues that the Learning Standards are aspirational and “world-class.” That the minimum requirements in order to obtain a high school diploma are aspirational, which connotes striving for something that is not necessarily achievable, may actually come as a surprise to high school students who must satisfy them. If these tests are aspirational, then the tests for an advanced high school diploma must be ultra aspirational. While some witnesses described the Learning Standards as “high” and “rigorous,” all the witnesses testified *938 that they represent the minimum students need in order to be productive citizens.[11] It is clear that in comparison to the RCTs, *939 the Learning Standards are indeed rigorous.[12] In addition, they are rigorous to the extent the Regents and the SED have determined that being a productive citizen requires learning the skills the Learning Standards impart. The record clearly supports the view that the Learning Standards satisfy the minimum required by the Education Article. In any event, even if the Learning Standards offered more than the minimum required by the Education Article, the State has a constitutional responsibility to ensure that students have the opportunity to meet those standards, since they are a prerequisite to a high school diploma (see 8 NYCRR 3.35, 100.1 [g], [t]; 100.2 [e]; 100.5).
The record establishes that the RCTs did not meet the constitutional minimum because at the high school level, they prepared students to read at an eighth grade level or perform sixth grade mathematics. As a result, students who obtained a local diploma were not assured that they received a high school education. They might have graduated from high school, but the education offered was effectively primary.[13] It is not surprising then, that, as found by the Mayor’s Advisory Task Force on the City University of New York, a majority of CUNY freshmen, about half of whom were graduates of New York City *940 high schools, required remedial courses (The City University of New York: An Institution Adrift, at 21-22 [June 7, 1999]).[14]
It is this Court’s constitutional responsibility to review the educational standards established by the Regents and determine whether they meet the constitutional minimum. A finding that the Learning Standards meet the constitutional minimum does not somehow constitute an abdication of this Court’s responsibility to interpret the Education Article. On the contrary, it would be the failure to review the educational policies of the State to determine if they satisfy the requirement of the Education Article that would constitute a dereliction of this Court’s duty to say what the law is. To conclude that courts should not question what the Legislature, through the Regents, determines is a sound basic education is to conclude that this Court should play no role in interpreting the Education Article. It is the responsibility of the State to offer the opportunity of a sound basic education, and it is the responsibility of this Court to determine whether the State is fulfilling its responsibility to the plaintiffs.
The Formulas Do Not Equal A Sound Basic Education
New York’s public education system is supported and maintained by funds from three sources: localities (about 56%), the State (about 40%), and the federal government (about four percent). The Legislature has given most boards of education the authority to raise local funds by imposing taxes on residential and commercial properties within each district. In addition, the boards have no constitutional tax limits. The so-called Big 5 cities (Buffalo, New York City, Rochester, Syracuse, and Yonkers), on the other hand, have constitutional tax limits that apply to the total municipal budget. In addition, the *941 boards of education of the Big 5 lack the authority to levy taxes, making them fiscally dependent. Rather, their appropriations are part of the overall budget, which is funded through citywide taxes, including property taxes, sales taxes, and income taxes. As stated by Dr. Robert Berne, Vice-President for Academic Development and professor of public administration at New York University, this means that “within the confines of the City budget process, education competes directly for other municipal services as opposed to being separate in an independent school district.” According to the SED, the “fiscal dependence on these school districts is fraught with problems related to level and stability of funding and the effective use of education dollars.” One obvious problem for districts in the Big 5 is that during a fiscal crisis, local appropriations for schools may fall dramatically, affecting their ability to provide the opportunity for a sound education. The same is not necessarily the case in fiscally independent districts since property values tend to be stable, and in fact, may rise during difficult economic times. In the words of Dr. Berne, “Compared to the resources say in New York City where it is a combination of all of the general resources, the property tax is less, economically less sensitive and more predictable tax.” Another problem is that in addition to having limits in the amount that they can borrow, there are also State-imposed limits in the amount of taxes cities may levy.[15]
The State uses a system comprised of about 54 formulas to distribute about $13 billion of state aid. Historically, New York City has received close to 34% of the total of state aid. For 1999, New York City’s Board of Education had a budget of $9.8 billion. The average per-pupil expenditure for that year was $8,957. The roughly 1.1 million public school students in New York City make up 37% of the total state student population. About 73% of New York City students qualify for the federal government’s free or reduced price lunch program that is targeted to poor students. About 72% are African-American or Hispanic. About 80% of all state students with limited English *942 proficiency attend New York City public schools. A substantial number of New York City students are said to be at risk of doing poorly in school because of socioeconomic disadvantages, including poverty, race and limited English proficiency. The record establishes that these students need more help than others in order to meet educational goals, such as extended school programs, remedial instruction, and support services.
The most important category of formulas is termed basic operating aid, which distributes $5 to $6 billion of state aid based on weighted attendance and wealth of school districts. Although we held in Board of Educ., Levittown Union Free School Dist. v Nyquist (57 NY2d 27 [1982]) that the Education Article does not require equality of educational resources, operating aid seeks to have a wealth equalizing effect by giving more to low-value property districts and less to high-value property districts. Operating aid also distributes flat grants to each district regardless of the level of wealth.
New York City receives about 36% of operating aid. Mr. Kadamus testified that operating aid treats New York City as an average wealth district, overlooking the high concentration of poverty. Thus, it is “impossible for that particular aid formula to drive a lot of additional money into New York City, so, therefore, you have to use other parts of the formulas to do that and so far those parts of the formulas have not been particularly well-funded compared to the operating aid formula.”
The State did make an attempt to ensure that high-need districts have adequate resources by adopting an Extraordinary Needs Aid (ENA) formula in 1993. About 93% of New York City students fall within the ENA formula. Thus, New York City received most of the funding allocated to ENA. Despite this, however, New York City’s total state aid allocation hardly changed after ENA was phased in, largely because ENA only accounts for about five percent of the total state aid. Mr. Kadamus testified that ENA fails to provide districts with high-need students with the needed funds.[16] The former Director of the State Division of the Budget, Robert L. King, testified that the central budget office had not determined whether the amount allocated under ENA provided schools with the necessary funds to educate at-risk children. In the same vein, the Division has not sought to determine whether school districts have suf *943 ficient resources to provide students with an adequate education.
Year after year the formulas have consistently failed to measure the actual costs necessary to provide New York City students with a sound education. Rather, New York City’s share of state aid has been close to 34% regardless of the City’s actual education needs. The record supports Dr. Berne’s opinion that “it is well known that the share of New York City’s increase in aid is determined first in the legislative process and then the formulas are actually driven backwards to get that share to come out.”[17]
The Paper Trail
The ineffectiveness of the formulas has been documented by the Regents. While the Regents are responsible for establishing educational policy in the State, they have no equivalent power with respect to funding. That power is in the hands of the Governor and the Legislature. However, the Regents, along with the Commissioner of Education, suggest to the Legislature the amount of spending they believe is necessary to meet the educational goals they have established. Each year, the Regents and the SED submit to the Governor and the Legislature an annual report containing a great deal of information about the state of the education system, which is designed to ensure greater correlation between student outcomes and expenditures (Education Law § 215-a). In addition, the Regents and the SED regularly appoint formal committees and task forces to study educational issues. Virtually every document in the record prepared by the Regents or the SED dealing with funding has been critical of the formulas. For example, the Regents’ Proposals on School Aid for 1993-1994 and 1994-1995 state that the formulas:
*944 “• do not provide adequately for all students, especially the most needy
“• are unduly complicated, with 53 separate formulas governing the distribution of aid
“• inhibit local flexibility, since many kinds of aid require specific programs whether or not such programs are the best use of the money
“• entail no accountability for results, because districts continue to receive the money no matter what
“• do not deal adequately with local differences in wealth and cost
“• do not adequately support needed improvements in teaching and learning * * *
“• lack public credibility, for all of these reasons.”
The preface to the 1999 annual report prepared by the Regents and the SED finds that:
. “[W]ith few exceptions, the formulas do not consider the extra help in achieving the standards needed by children placed at risk by poverty and limited proficiency in English. Thus, because New York City’s property and income wealth per pupil is close to the State average, its State aid allocation per pupil is also close to the State average. The fact that the City’s percentage of students eligible for free lunches exceeds the State average by 28 percentage points (73 compared with 45 percent) does not substantially increase their State aid allocation.”
A 1999 Discussion Paper prepared by the SED for the Regents Subcommittee on State Aid (Moving Towards Adequacy, Recognizing High Cost Factors In the Financing of Public Education) concluded the formulas did not take into account regional cost differences in professional service costs and the number of high need pupils. The Paper made several proposals, which it noted,
“recognize and correct the fundamental unfairness of allocating $3,000 in State Aid per pupil to districts which are identical in fiscal capacity. One *945 district is located in a high cost area of the State where this $3,000 has a purchasing power of only $2,250 and 80 percent of the student body live in households that fall below poverty. The second district is in a low cost area of the State where the purchasing power equivalent of this $3,000 is $3,500 per pupil and only 10 percent of its student body is poor.” (At 8.)
The Paper also reaffirmed the conclusion of substantial prior research that “as the concentration of children in poverty increased at the school building level, achievement decreased. These negative achievement effects were not trivial but dramatic.” (At 5.) As to the relationship between funding and student need, the Paper found that 93% of New York City students fell within the ENA formula, and that this percentage:
“was almost three times greater than the comparison percentage of other districts similar to New York City in their wealth. Since State Aid is highly equalizing with respect to wealth, but less well equalized with respect to the concentration of disadvantaged pupils, the unusually high concentration of disadvantaged pupils places it at a funding disadvantage.” (Id.)
Although the distribution of $10.4 billion in state aid “was found to be highly wealth equalized” when it was “recalculated on a poverty-weighted pupil basis, the desired equalization of the current aid distribution diminished significantly.” (Id.; emphasis omitted.)
The same observation was made in the foreword to the Regents’ Proposal on State Aid to School Districts for the School Year 2000-2001. According to its foreword:
“At a time when the Regents have imposed higher standards for graduation throughout the State’s public schools, it is important that State aid to school districts must be better targeted on those districts with the highest costs and the farthest to go to meet the standards. * * *
“Throughout history, State Aid to education has not been distributed in a manner that both recognized student need and provided incentives for academic improvement. In addition, schools and *946 districts were not held accountable for the results of education spending. Rather, State Aid has been distributed based primarily on the wealth of a district as measured by its real estate assessments and income of residents (the lower the value of its combined wealth, the more the aid) and its student attendance. Accordingly, State Aid has been distributed on a district’s theoretical capacity to pay for education, with limited regard to educating its students to desired levels.
“The New York City School District has been affected by this process with its near-average wealth and high student need. The result is that the district has never enjoyed State Aid increases that reflect the costs of educating all students to levels accepted in the rest of the State. Student results have shown that many schools have great difficulty in meeting student needs. The State and the nation must face the exorbitant costs for public assistance, criminal justice and lost productivity that such education failure requires.”
The then-current Chancellor of the Regents, Dr. Hayden, was asked, “Do you believe that you have a thorough understanding of the state aid formula system?” He replied, “I do not.” When asked why not, he said, “I think it defies scrutiny * * * [Q]uite frankly, I think there are very few people in the State of New York who understand the state aid formula and how it works * * * I believe the public is at an extreme disadvantage when it cannot follow the way in which the money moves.” The same sentiment was expressed by Dr. Sobol. He testified that the complexity of the formulas “made it more difficult to direct the aid where we thought it was most needed, namely, with those students who were not now enjoying the benefits of the resources needed to require the sound basic education.” Under his helm, the SED was concerned with disparities in wealth and cost across the State “not only because of the inequality, but because of the inadequacy, because, in some situations, it makes it impossible for local schools or school districts to provide the conditions that students need if they were to obtain the sound, basic education under the constitution.” New York City was one of these school districts.
The current Commissioner, Dr. Mills, testified that he did not have a deep understanding of how the formulas work, and *947 that only “very few people” do. Dr. Berne, who is one of those few people, testified that the formulas are extremely complex, making it “hard for most people in the State to understand and * * * easier for manipulation.” The shares agreement “negates the general factors that are shown in the formulas * * * that are supposedly driving resources to children in school districts.” The complexity of the formulas and the decision to predetermine the amount New York City students need are the culprit for the lack of “alignment between educational goals and the components of the school finance system.” Defendant Governor Pataki has called the formulas “incomprehensible,” “convoluted,” and destined for the “ash heap of history.”[18]
Remedies
The formulas have consistently failed to provide New York City schools with the funds necessary to allow them to provide a sound education for their students. Despite constant fine-tuning, the formulas have impeded the duty of the Legislature to maintain and support an effective system of public schools in New York City. In fact, their Byzantine complexity makes it possible for aid to be distributed in an arbitrary manner that bears no relationship between educational goals and costs associated with meeting those needs. Consequently, the formulas are incompatible with the Legislature’s duty to provide a sound education to New York City students. Since the formulas are used to distribute aid to all the schools in the state, the remedy must necessarily affect the entire interdependent school system. In place of the formulas, the Legislature should institute a scheme that: (1) eliminates the current state formula for distributing aid to New York City; (2) determines, to the extent possible, the actual costs of the resources needed to provide the opportunity for a sound basic education in all school districts in the state; and (3) ensures that at a minimum every school district has the necessary funds to provide an opportunity for a sound basic education to all of its students.
While the foregoing may not guarantee that the opportunity of a basic education will be available to all the children in the state, they are necessary steps in that direction. In sum, I join the decision of the Chief Judge, but the Constitution requires the State to do even more than is stated to ensure a sound basic education for all students.

. See the dissent in Paynter v State of New York (100 NY2d 434, 444 [2003] [decided today]).

. The first sentence of section 5 of article XVII, states, “The legislature may provide for the maintenance and support of institutions for the detention of persons charged with or convicted of crime and for systems of probation and parole of persons convicted of crime.”

. Article XVII, § 1, states, “The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine.”

. Article XVIII, § 1, states, “Subject to the provisions of this article, the legislature may provide in such manner, by such means and upon such terms and conditions as it may prescribe for low rent housing and nursing home accommodations for persons of low income as defined by law, or for the clearance, replanning, reconstruction and rehabilitation of substandard and insanitary areas, or for both such purposes, and for recreational and other facilities incidental or appurtenant thereto.”

. The record supports the conclusion that the State fails to provide a significant number of children even the opportunity to learn these rudimentary skills.

. Defendant Governor Pataki has publicly declared: “I totally disagree with the concept that an eighth-grade education is adequate, and it will never be the policy of this state so long as I am the governor of this state” (Shaila K. Dewan, Pataki Attacks June Ruling that 8th-Grade Education is Enough, New York Times, Sept. 13, 2002, at B6, col 1).

. Thomas Sobol, who served as Commissioner of Education from 1987 to 1995, testified that a high school diploma is the “lin[g]ua franca of our society educationally.” Dr. Levin, educational economist at Columbia University’s Teachers College, testified that it is the “conventional wisdom that [high school] dropouts are increasingly disadvantaged in the labor market relative to high school graduates.” The reason for this is “that the labor market is changing in terms of the demand for skills that we have moved very heavily towards intellectual work, new forms of production and also new forms of work organization that require much more skill than they have in the past.”
*935 Dr. Levin concluded that for every dollar spent to ensure that students graduate from high school, “there’s a return of about six to $7 for society as a whole, just in earnings alone, and that the revenues that are generated are about twice that of the costs.” As to high school dropouts who obtain a general equivalency diploma (GED), Dr. Levin testified that “the job prospects and lifetime earnings of the GED certificates is [szc] considerably less than that of the high school graduate. In fact, it is equal or close to that of high school dropouts.” The military, which originated the idea, no longer considers a GED the equivalent of a high school diploma. In addition, the four-year college graduation rate of GED holders is about two percent.

. Dr. Sobol testified that “preparation for the world of work in this case for sustaining competitive employment has very long been a purpose of the public schools of the United States. * * * [T]he skills that students need in today’s world to sustain competitive employment vastly outstrip the level of skill and knowledge that was generally requisite even as short a time as a generation or two ago.” Children in the 21st century “need to understand complex communications technology and be able to use it effectively. They will have to solve problems on the workforce in a changing scene. They will have to apply their knowledge to increasingly new situations. They are unlikely to learn one craft well and practice it for their entire lives but to move about as we see more and more.”
Dr. Linda Darling-Hammond, a professor at Stanford University and Executive Director of the National Commission on Teaching and America’s Future, testified that “preparing students for employment has been part of the rationale for public education since the beginning of public education in this country.” She also testified that the findings of abundant research in this area are “that students today need much higher levels of technical skills and knowledge than they did in the past; that that set of skills includes the ability to manage and comprehend complex text and information to manage resources. About 90 percent of the jobs that are in the economy today * * * are jobs that require at least a high school education and a level of technical skill in managing technology, text, and various kinds of content specific competencies that we used to expect of only about 50 percent of the employees in 1950.”
Even one of defendants’ experts, John Murphy, the President of Education Partners, testified, “I would think that a school system has a responsibility to prepare all of its children to compete in this society, yes.” He then agreed with the statement that to “compete in society means to get a good, productive job.”

. In 1894, there were in total 96 universities and colleges with 23,835 students in New York. There were also in total 437 high schools with 45,036 students (3 Lincoln, Constitutional History of New York, at 549-550). At the national level, only 10% of teenagers were enrolled in high school in 1900. Forty years later, the percentage had risen to 70%. The figure now is about 95% (Diane Ravitch, American Traditions of Education, in A Primer on America’s Schools, at 13 [2001]). In 1960, about 41% of adults had a high school diploma. By 1998, that figure was 82%. About the same percentage of adults in New York have a high school diploma (Robert Putnam, Bowling Alone: the Collapse and Revival of American Community [2000]). Education Law § 3205 requires children from ages 6 to 16, with certain exceptions, to attend full time instruction. A person under 21 years old who has not received a high school diploma is entitled to attend for free the public school in his or her district (Education Law § 3202 [1]).

. It is already the official policy of the Regents that an education should prepare children “to compete successfully in today’s demanding global society.” It is also worth noting that a 1996 National Education Summit attended by 44 governors and 44 chief executive officers of major national *937 corporations adopted, on behalf of the President of the United States, the policy statement that “[t]he primary purpose of education is to prepare students to flourish in a democratic society and to work successfully in a global economy” (emphasis added).

. Dr. Sobol initiated a 13-year quest to determine the skills that a sound basic education should provide. Dr. Sobol spearheaded the creation of seven “curriculum committees, each in key areas of the school curriculum” composed of experts from just about every field. The Learning Standards are the work product of these committees. According to Dr. Sobol, the Learning Standards “operationalize the conditions that would lead to a sound basic education.” The Learning Standards were not entirely completed during Dr. Sobol’s tenure, and the work was continued by his successor, Dr. Richard Mills. According to Commissioner Mills, the Learning Standards seek to ensure that
“all students in New York are prepared to be citizens, to, in other words, be able to vote and know what they are voting on and carry the other burdens of the citizenship, serve on juries and do all the other things that citizens must do; to prepare them for work, have a choice for work, to be competent in that work, to be able to grow in that work as work changes and to be competent as individuals.”
In his memorandum to the Regents explaining the Learning Standards and urging the Regents to adopt them, Commissioner Mills stated: “All children need strong skills and knowledge to grow' into competent, caring, productive adults and citizens in a free society. To give any student an undemanding or watered-down education is not a kindness; it’s wrong.” Commissioner Mills testified that “at-risk” students can satisfy the Learning Standards, but that they require additional resources in order to do so.
The Chancellor of the Regents, Carl T. Hayden, testified that the Learning Standards sought to reverse the education system’s “inextricable slide into mediocrity,” and that too many children were graduating but could not “demonstrate the rudiments of reading, writing, and computation.” He testified that the ultimate purpose of the Learning Standards “is to give our young people the skills and knowledge they need in order to be effective citizens, effective mothers and fathers, effective participants in our great democratic enterprise and people who can compete in an economy that is in the midst of a dramatic transformation.” Moreover, he testified that the Learning Standards “are not too high. These standards represent our judgment about what our young people need.”
SED Deputy Commissioner for Elementary, Middle, Secondary and Continuing Education, James A. Kadamus, testified that the standards “were based on studies that we had done of what it takes to be successful in the world of work and be successful in higher education, and so it is based on the current — what are the current requirements of the work force and higher education.” He testified that “[w]e want all students to achieve a certain set of standards without holding back students that could go way beyond that point, so we want both. We want all students to achieve the learning standards, and the students who have the motivation and capability who could go far beyond, we want the incentives to do that.” The standards are beyond the competency standards; they go beyond “basic literacy, calculating, and verbal skills.” The State relies on the latter statement and others in arguing that the Learning Standards are too high. A sound basic education requires teaching and learning the skills to become a productive citizen. Rudimentary reading, writing and math are not enough. Thus, the Learning Standards are *939 high only to the extent that they require more than being able to perform simple math, and read and write at the most basic level.

. The Learning Standards are relatively numerous and lengthy, but to get a general sense of what they require, the first standard for English Language Arts states as follows:
“Language for Information and Understanding * * * Students will read, write, listen, and speak for information and understanding. As listeners and readers, students will collect data, facts and ideas; discover relationships, concepts and generalizations; and use knowledge generated from oral, written, and electronically produced texts. As speakers and writers, they will use oral and written language that follows the accepted conventions of the English language to acquire, interpret, apply, and transmit information.”

. According to Commissioner Mills:
“[T]he math Regents competency test is only arithmetic; and while some people may think that’s enough, you can’t get into an apprenticeship program without algebra; you certainly can’t do college-level work; you can’t understand technology; you can’t even deal with the daily newspaper without something more than arithmetic. So it is not minimal — it is not minimally acceptable.”

. The Task Force also found that “[rjecent decades have seen a restructuring of the City’s economy from one based on manufacturing to one driven by services. Finance, insurance, and real estate dominate the marketplace and account for disproportionately high shares of income. Along with medical services, business services, and communications and entertainment, these are the prime sources of good jobs. Advanced technology counts for an increasing share of the City’s employment ** * * Each of these sectors of job growth is relentlessly competitive, requiring high-level academic skills for success. * * * [W]ith certain exceptions such as tourism, traditional jobs requiring less education are declining. Jobs in manufacturing have been dropping at about the same rate as jobs in services have been increasing. * * * Opportunities for less-educated workers are likely to keep declining, while continued increases in the services sector will bring more good jobs to people with computer skills who are literate, can write, and are well-grounded in science and mathematics.” (Id. at 13-17.)

. The State attempted to ensure that the City’s contribution to education remains stable despite changes in the economy by enacting a law commonly known as the Stavisky-Goodman Law (Education Law § 2576 [5]). According to Dr. Berne, the law has not been effective at ensuring that contributions from the City remain stable because it applies to all funds in the New York City budget received from local taxes, the State and the federal government, and because it is not clear who can invoke it. A recent law enacted in 2002 makes clear that it applies only to the City’s own budget (L 2002, ch 91, § 5, adding Education Law § 2576 [5-a]).

. This view was reiterated by Harold Levy, former member of the Regents and former Chancellor of the New York City Board of Education.

. A 1996 report by the then State Comptroller H. Carl McCall, entitled An Agenda for Equitable and Cost-Effective School Finance Reform, concluded as follows: “The current day complexity and convoluted nature of the aid system is the result of many years of manipulation of the formulas through the budget process. Each year the legislative leadership and the executive agree on some broad parameters for school aid, such as how much the year-to-year increase will be and on how, overall, the aid will be distributed among regions. The formulas and grant programs are then altered by technicians to achieve the desired result. Although the formulas were originally intended to reflect need, each year’s manipulation is in truth most heavily driven by a politically determined distribution requirement. The focus is always on a single year’s aid distribution rather than on conceptual concerns about need and how aid should be provided. The cumulative result of this annual patchwork is therefore quite naturally a jumble.” (At 31.)

. See Governor Pataki’s press release of January 3, 2001, available at <http://www.state.ny.us/govemor/press/year01/jan03_2_01.htm>.